**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| CAFÉ VALLEY, INC.<br>7000 West Buckeye Road<br>Phoenix, AZ 85043, | )<br>)<br>) | Case No. _____ |
| | )<br>) | Judge _____ |
| Plaintiff, | )<br>) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| v. | )<br>) | |
| COOPER FARMS, INC.<br>22348 Road 140<br>Oakwood, OH 45873, | )<br>)<br>)<br>) | |
| | ) | |
| Defendant. | ) | |

\* \* \*

Plaintiff Café Valley, Inc. for its Complaint against Defendant Cooper Farms, Inc. ("Cooper") states as follows:

## **INTRODUCTION**

1. This is a breach of contract action. Defendant Cooper Farms, Inc. breached its obligation to supply Plaintiff Café Valley, Inc. with all egg products that Café Valley required at the agreed upon contract prices.

2. Rather than honoring its contractual customer commitments to Café Valley, Defendant Cooper in bad faith decided to sell its egg products to other customers at higher prices to reap higher revenue.

3. In and after February 2025, Café Valley placed several orders for egg products, which Cooper failed to fill in breach of Cooper Farms's contractual obligations.

4. Instead, Cooper unreasonably and in bad faith attempted to rely upon a force majeure provision in the agreement to escape performance of its contractual obligations.

5. While Cooper may have suffered the loss of some of its laying hens due to an outbreak of avian influenza, the loss of its company-owned laying hens in and of itself does not constitute a force majeure event that would excuse Cooper Farms from performing any obligations under the agreement.

6. The claimed force majeure event did not cause a shut-down of Cooper's egg breaking plant that produced the liquid egg product sold to Café Valley. In fact, Cooper continue to produce cage free liquid egg product, but Cooper failed to mitigate the impact of its loss of company-owned conventional laying hens by substituting cage free liquid product. Cooper is able to charge more for cage free liquid egg products than liquid egg product produced from laying hens that are raised conventionally.

7. Cooper continued to produce its own eggs, and certainly had the ability to procure additional eggs for its egg breaking plant.

8. In addition, the force majeure clause in the parties' contract required Cooper to mitigate the effects of any force majeure event.

9. Café Valley repeatedly asked Cooper to explain what steps, if any, Cooper took to mitigate the effects of the claimed force majeure event.

10. Cooper was unable to explain what, if anything, it did to mitigate the effects of the asserted force majeure event.

11. To be sure, the claimed force majeure event did not prevent Cooper from continuing to sell and market eggs and liquid egg products to other customers.

12. Cooper had an affirmative duty to allocate its eggs and egg products to Café Valley as a long-term contract customer before selling any eggs or egg products on the spot market or to other customers.

13. Cooper breached its obligation to allocate any egg products to Café Valley.

14. The reason why Cooper failed to allocate eggs to Café Valley is that Cooper did not want to be bound by the contractual price to which Cooper agreed when it drafted and executed the Egg Supply Agreement with Café Valley. Because there was a perceived, or real, shortage of eggs in the U.S. market, which increased the price of eggs, Cooper made a bad faith decision to seek higher prices over honoring its contractual commitments.

15. Just weeks after Cooper fraudulently declared a force majeure event and refused to fill orders from Café Valley for conventional liquid egg products, Cooper's salesmen were at a tradeshow in California called Expo West trying to find new customers for Cooper's products.

16. Because of Cooper's breach of its obligation to supply Café Valley's requirements for egg products, Café Valley was forced to procure eggs on the open market at considerably higher prices.

17. Cooper's breach of contract has caused, and will cause, Café Valley significant damages, in an amount to be proven at trial.

18. By repudiating and unilaterally terminating its supply obligations at a time of historically high egg prices, Cooper forced Café Valley to seek an alternative contractual egg supply at an inopportune time in the market, which will continue to cause Café Valley damages for years to come.

**PARTIES**

19. Plaintiff Café Valley, Inc. is a Delaware corporation with its principal place of business located at 7000 West Buckeye Road, Phoenix, Arizona.

20. Defendant Cooper Farms, Inc. is an Ohio corporation with its principal place of business located at 22348 Road 140 Oakwood, Pauling County, Ohio.

**JURISDICTION AND VENUE**

21. This Court has federal diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Ohio and a citizen of Delaware and Arizona, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), in that Defendant resides in this District under 28 U.S.C. § 1391(c)(2).

23. Venue is also proper in this District because the Agreement between the Plaintiff and Defendant contains a venue provision that requires any action to be brought in Ohio.

**FACTUAL BACKGROUND**

24. Plaintiff Café Valley is a bakery that produces high quality bakery products for in-store bakeries, club stores, food service and convenience stores throughout the world. The products that Café Valley bakes include croissants, muffins, cakes, and turnovers, plus its signature Café Bites.

25. Café Valley has two bakeries, one in Phoenix, Arizona, and the other located in Marion, Indiana.

26. From its bakeries, Café Valley's products are shipped directly to its customers resulting in the finest ready-to-eat products available in grocery stores, club stores and well-known restaurant chains.

27. Café Valley's customer list is a Who's Who in the grocery retailing industry. The reasons are simple: Café Valley's baked goods are delicious and Café Valley treats its customers exceptionally well.

28. Café Valley also offers exceptional value to its customers through competitive pricing, which Café Valley achieves by entering into long-term supply contracts for ingredients and effectively managing its costs.

29. One ingredient that is in almost all of Café Valley's baked goods is eggs.

30. In order to ensure that Café Valley could honor its commitments to its own customers, Café Valley entered into a long-term supply agreement with Defendant Cooper Farms, Inc. for the supply of egg products.

31. Defendant Cooper Farms is a large commercial farming operation that sells pork, turkey, and egg products, which includes both shell eggs and liquid egg products.

32. Cooper Farms owns an egg breaking facility at which it takes breaking stock eggs and off-fall, which are eggs that are not graded to be table eggs, and breaks those eggs to produce liquid egg products.

33. Cooper Farms is vertically integrated. It owns laying hens that produce eggs, and then supplies those eggs to its egg breaking plant that produces the liquid egg products sold to Café Valley.

34. While Cooper owns some of its own animal production, including laying hens, it also sources egg from other farming operations.

35. Cooper's egg breaking facility can and does source eggs both from Cooper's own egg production flocks and from other egg companies and farms.

5

36. Cooper's egg breaking facility where it produces liquid egg products is not in-line, or directly connected to, a farming operation that houses laying hens.

37. Because Cooper's egg breaking facility is not an in-line plant, Cooper can source breaking stock eggs from which to make liquid egg products from any source.

38. While it may be cheaper for Cooper to use eggs produced in its company-owned laying operations, Cooper's egg breaking facility is not limited to using only eggs produced by hens owned by Cooper, but instead, is capable of taking in eggs to be broken and made into liquid egg products from any source.

39. On December 21, 2022, Café Valley entered into the Cooper Farms, Inc. Egg Supply Agreement ("Egg Supply Agreement").[1]

40. The Egg Supply Agreement is Cooper's standard agreement, which was drafted by Cooper.

41. The Egg Supply Agreement commenced on December 21, 2022 for an initial term of three (3) years, which runs through December 21, 2025.

42. Under the terms of the Egg Supply Agreement, Cooper was required to supply all of Café Valley's requirements for egg products through the end of the initial term.

43. The Egg Supply Agreement set forth the specifications for the egg products and the pricing for the egg products, which applied through the end of the initial contract term.

44. Notably, the Egg Supply Agreement is not a single-source contract.

45. Nothing in the Egg Supply Agreement, including the product specifications, states that the liquid egg products Cooper contracted to sell to Café Valley had to use only eggs supplied from Cooper's company-owned laying hens.

---

[1] The Egg Supply Agreement contains confidential business terms and is therefore not attached to this Complaint.

46. Rather, Cooper could source eggs for its egg breaking facility from any egg company or egg farm, including on the spot market.

47. From on or about December 21, 2022, through approximately the end of January 2025, Cooper performed its obligations under the Egg Supply Agreement by timely filling Café Valley's purchase orders at the agreed upon contract prices.

48. Starting in or about February 2025, and continuing thereafter, Café Valley placed a number of purchase orders for egg products with Cooper, which Cooper failed to fill.

49. Unfortunately, in February and March 2025, Cooper repudiated its contractual obligations and informed Café Valley that it would cease supplying any products going forward.

50. For example, on March 11, 2024, Reid Linder, Cooper's National Sales Manager, wrote to Café Valley: "Unfortunately, we are not able to fill this order at this time."

51. Ironically, just days prior to telling Café Valley that Cooper would sell no more product under the Egg Supply Agreement to Café Valley, Reid Linder from Cooper was exhibiting at a trade show in Anaheim, California. Cooper's exhibit booth contained egg products.

52. Cooper was at the trade show on the hunt for new customers.

53. Cooper did not tell prospective customers at this trade show that it was unable to supply any egg products.

54. Café Valley asked Cooper repeatedly what, if anything, Cooper had done and was doing to mitigate any effects of disruptions in Cooper's supply chain.

55. Cooper was unable to describe any efforts Cooper took to mitigate the effects of any claimed disruption to its supply chain.

56. On information and belief, Cooper did nothing to mitigate the effects of any claimed force majeure event.

57. Cooper failed to source eggs for its egg breaking facility on the spot market to mitigate any loss of its own laying hens.

58. Cooper also failed to allocate any egg supply to its egg breaking facility.

59. Cooper failed to allocate liquid egg products to Café Valley.

60. Cooper failed to allocate eggs and liquid egg products first to its long-term contractual customers.

61. Cooper also failed to purchase liquid egg products on the spot market to sell to Café Valley to cover for Cooper's own supply disruptions.

62. In addition, avian influenza is something that was foreseeable and Cooper knew of the risk of its laying hens contracting avian influenza.

63. Cooper could have, but failed to, take all necessary precautions to mitigate the risks of avian influenza, and mitigate the effects of any loss of its laying hens.

64. For example, since Cooper entered into long-term sales contracts with customers like Café Valley, it could have also secured long-term supply agreements for breaking stock eggs to diversify its supply chain.

65. In addition, Cooper could have, but failed to, produce sufficient and adequate inventories of liquid egg products in advance to the seasonality risk of avian influenza.

66. Cooper did nothing to mitigate the effects of the temporary disruption to its company-owned laying hens.

67. Instead, even after it declared a force majeure event, Cooper admits that it sold liquid egg products on the open spot market through, among other channels, Eggs Unlimited and Egg Clearing House.

68. Cooper also admits that after it declared a force majeure event, Cooper sold over 100,000 pounds of liquid egg products to customers other than Café Valley.

69. Cooper breached the covenant of good faith and fair dealing by falsely declaring a force majeure event in bad faith to enable Cooper to make more money than the contract prices it was required to sell egg products to Café Valley.

70. Cooper's failure to allocate eggs to its contract customers, including Café Valley, was also a breach of the covenant of good faith and fair dealing.

71. Because Cooper refused to fill Café Valley's purchase orders, and due to Cooper's repudiation of the Egg Supply Agreement, Café Valley was forced to source eggs on the open market at prices considerably higher than the agreed upon contract prices in the Egg Supply Agreement to fulfill its own customer obligations.

72. As a consequence, Café Valley has suffered significant damages in an amount to be proven at trial.

73. In addition, because the initial term of the Egg Supply Agreement runs through December 21, 2025, Café Valley will continue to suffer additional damages by having to pay higher prices for egg products than the contract prices agreed to by Cooper in the Egg Supply Agreement.

74. It is unreasonable and unfair for Cooper to shift the obligation to purchase egg products on the open market to Café Valley when Cooper contractually agreed to supply Café Valley all of its required egg products through an initial term that ran until December 21, 2025.

75. Cooper's bad faith conduct completely subverts the purpose of the Egg Supply Agreement, which was to lock-in pricing for egg products to provide certainty for both Cooper and Café Valley.

76. Cooper is not permitted, either under the terms of the Egg Supply Agreement, which terms shall be construed against Cooper as the drafter, under the law, or in equity, to disregard its contractual obligations simply because its cost of performance increased temporarily.

## COUNT I
### (Breach of Contract)

77. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78. The Egg Supply Agreement drafted by Cooper and accepted by Café Valley is an enforceable contract.

79. Café Valley performed all conditions precedent to the Egg Supply Agreement.

80. Pursuant to the terms of the Egg Supply Agreement, Cooper was obligated to sell Café Valley all of Café Valley's required egg products through the end of the initial term of the Egg Supply Agreement.

81. The initial term of the Egg Supply Agreement ran through December 21, 2025.

82. In February 2025, and thereafter, Café Valley placed purchase orders for egg products with Cooper in accordance with the parties' prior practice and the requirements of the Egg Supply Agreement.

83. In breach of its obligations under the Egg Supply Agreement, Cooper failed to fill Café Valley's purchase orders for egg products.

84. In breach of the Egg Supply Agreement, Cooper repudiated its obligation to sell Café Valley eggs and told Café Valley that it would no longer supply Café Valley's requirements for egg products.

85. Cooper also breached the Egg Supply Agreement by failing to mitigate any effects of the claimed temporary supply disruption.

86. Cooper breached the Egg Supply Agreement by failing to make reasonable efforts to procure eggs to supply its egg breaking facility.

87. Cooper breached the Egg Supply Agreement by failing to purchase egg inputs on the spot market to mitigate the impact of any disruption to Cooper's own egg supply.

88. Cooper also breached the Egg Supply Agreement by failing to find alternative liquid egg product to sell to Café Valley to fulfill its contractual obligations.

89. Cooper breached the covenant of good faith and fair dealing and its obligations under O.R.C. Sec. 1302.73(B) (U.C.C. Sec. 2–615(b)) by failing to fairly and reasonably allocate eggs and egg products to customers, including Café Valley.

90. Cooper breached the covenant of good faith and fair dealing by failing to allocate eggs to its egg breaking facility.

91. Cooper breached the covenant of good faith and fair dealing by failing to allocate liquid egg products to its contract customers, including Café Valley.

92. Cooper also breached the Egg Supply Agreement, and the covenant of good faith and fair dealing, by selling egg products on the spot market at prices higher than Cooper agreed under the terms of the Egg Supply Agreement.

93. Cooper also breached the implied covenant of good faith and fair dealing by intentionally and in bad faith deciding to sell egg products that it was contractually required to sell to Café Valley to other customers at higher prices thereby reaping excess sales revenue on those sales.

94. Because Cooper entered into a long duration contract with Café Valley, Cooper was required under the covenant of good faith and fair dealing to first sell to Café Valley all of Café

11

Valley's requirements for egg products prior to selling any egg products to any other customer or on the spot market.

95. And even if Cooper had other contract customers, Cooper was required under the covenant of good faith and fair dealing to allocate all available egg products fairly and in good faith to all of its contract customers – not based on the contract prices previously agreed to by Cooper, but one a fair and reasonable basis based, for example, on the volume of customer purchasers prior to the claimed shortage of product caused by a claimed force majeure event.

96. Due to Cooper's refusal to fill its purchase orders, repudiation of the Egg Supply Agreement, and failure to allocate egg products to Café Valley, Café Valley was forced to purchase eggs on the spot market at prices considerably higher than the prices it contracted to pay to Cooper for the same products.

97. Consequently, as a direct and proximate result of Cooper's numerous breaches of the Egg Supply Agreement, Café Valley has suffered damages in an amount to be proven at trial in excess of $75,000.00.

98. In addition, because Cooper's obligations to supply all of Café Valley's requirements for egg products through an initial term ending December 21, 2025, Café Valley will continue to suffer damages as a result of having to pay higher prices for eggs than the contract prices agreed upon in the Egg Supply Agreement.

**COUNT II**
**(Unjust Enrichment)**

99. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Pursuant to Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff alleges in the alternative that Defendant has been unjustly enriched through its bad faith conduct in selling products to other

customers at higher prices that Defendant was contractually required to sell to Plaintiff at lower prices thereby being unjustly enriched by realizing higher revenue than Defendant was otherwise entitled. *See, e.g., JCM Ins. Services, Inc. v. Gov't Employees Ins. Co*., 1:23-CV-1801, 2024 WL 4264942, at *6 (N.D. Ohio Sept. 23, 2024)

101. Cooper unjustly received a direct benefit from Cooper's decision to not allocate any egg products to Café Valley and to instead sell egg products that Cooper should have sold to Café Valley to other customers at higher prices.

102. It would be unfair and unjust to allow Cooper to retain the benefit of the excess prices it charged and excess revenue it realized through sales of egg products to other customers when Cooper should have sold those egg products to Café Valley.

103. Cooper should be required to disgorge and pay to Café Valley the ill-gotten gains Cooper realized from the sale of egg products to other customers at higher prices.

## COUNT III
### (Declaratory Judgment)

104. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105. Pursuant to Ohio Revised Code § 2721.02, and 28 U.S.C. § 2201, Plaintiff requests that the Court construe is rights, status and other legal relations, affected by the Egg Supply Agreement and declare its rights, status and other legal relations thereunder.

106. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether Defendant breached the Egg Supply Agreement and, specifically, whether Defendant had a good faith basis for declaring a force majeure event and failing to supply eggs to Plaintiff.

13

107. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether Defendant was required to supply Plaintiff all of Plaintiff's requirements for egg products and to fill all of Plaintiff's purchase orders submitted to Defendant.

108. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether Defendant used reasonable efforts to mitigate the impact of any force majeure event.

109. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether as a reasonable mitigation effort Defendant should have sourced eggs or egg products on the spot market to cover for any lack of supply and sell those eggs or egg products purchased on the spot market to Plaintiff.

110. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether Defendant reasonably and fairly allocated eggs and egg products to Plaintiff.

111. There is an actual and justiciable controversy between Plaintiff and Defendant as to whether Defendant must immediately cease and desist from selling eggs and egg products on the spot market or to customers without contracts that predated the force majeure event and instead sell those eggs and egg products to Plaintiff.

112. Declaratory relief from this Court will terminate the controversy or remove the uncertainty giving rise to this action and is necessary to preserve the parties' rights.

113. Under Ohio Revised Code Sections 2721.02(A) and 2721.04, this Court has jurisdiction to construe the Egg Supply Agreement and to declare the rights, status, and other legal relations of the parties.

114. The declaration may be either affirmative or negative in form and effect.

115. The declaration may grant specific performance of all obligations under the Egg Supply Agreement.

116. Plaintiff requests a declaratory judgment in its favor that Defendant has breached the Egg Supply Agreement, that Defendant did not have a good faith basis for declaring a force majeure event, that Defendant did not mitigate the effect of any force majeure event, that Defendant was not contractually permitted to stop selling products to Plaintiff, that Defendant failed to allocate products to Plaintiff, and that Defendant must cease selling eggs and egg products on the spot market and must instead fill all Plaintiff's purchase orders at the contract prices.

117. Such a determination is necessary and appropriate at this time in light of the controversy that exists between the parties.

118. The Court also has the power to grant further relief to Plaintiff based upon such declaratory judgment, pursuant to Ohio Revised Code Section 2721.09, including issuing injunctive relief: a) prohibiting Defendant from selling any eggs or egg products on the spot market; and b) requiring Defendant to fill all of Plaintiff's purchase orders at the agreed upon contract prices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court enter judgment against the Defendant and in favor of Plaintiff, and award the following relief:

    a.    Damages in an amount in excess of $75,000.00, plus pre- and post-judgment interest;

    b.    Declaring that Defendant breached the Egg Supply Agreement;

    c.    Costs, expenses, disbursements, penalties, and attorney's fees as recoverable at law or in equity; and

    d.    Granting such other and further relief as may be appropriate under the circumstances.

Dated: May 2, 2025    */s/ Matthew T. Kemp*
Matthew T. Kemp (0093136)
Madison D. Hamm (0105169)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604
Telephone: (419) 241-9000
Facsimile:  (419) 241-6894
Email: mkemp@shumaker.com
       mhamm@shumaker.com

Troy J. Hutchinson (Minnesota Bar No. 0320420)
ROCK HUTCHINSON, PLLP
120 South Sixth Street, Suite 2480
Minneapolis, MN 55402
Telephone: (612) 573-3688
Facsimile: (612) 330-0959
Email: thutchinson@rockhutchinson.com
*(Pro Hac Vice Motion Forthcoming)*

*Counsel for Plaintiff Café Valley, Inc.*

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 2, 2025    */s/ Matthew T. Kemp*
Matthew T. Kemp (0093136)
Madison D. Hamm (0105169)
SHUMAKER, LOOP & KENDRICK, LLP

Troy J. Hutchinson (Minnesota Bar No. 0320420)
ROCK HUTCHINSON, PLLP
*(Pro Hac Vice Motion Forthcoming)*

*Counsel for Plaintiff Café Valley, Inc.*